Our first case is from the PTAB, Pfizer v. Sanofi Pasteur and SK Chemicals, 2019, 1871, 73, 75, 76, and 22, 24. Mr. Scheibler, please proceed. May it please the court. My name is John Scheibler. I represent Pfizer, the appellant here. The appeal concerns five IPR decisions that found the claims of the Pfizer's 559 patent invalid for obviousness. And I'd like first to address why this court should reverse the board's decision, finding claims three and four, the dependent claims, obvious. And that's discussed in detail at page 39 of our opening brief and at page 19, beginning at page 19 of our reply brief. In essence, the decision is not support on claims three and four by the board, is not supported by substantial evidence. Claim three recites a three-valent pneumococcal serotype multivalent conjugate composition. It requires the 22F serotype glycoconjugate from claim one plus two additional conjugates of serotypes 15B and 33F. Claim four depends from claim three and adds conjugates of four additional serotypes, namely serotypes 12F, 11A, 10A, and 8, for a total of seven conjugates. Now, the board in the final written decision determined that the term immunogenic in the claims requires immunogenicity across all the serotypes in the composition. So the board also determined that the term immunogenic is construed as eliciting functional antibody. And this is at APPX 280 of the Sanofi decision, and it's in the other decisions as well. I should mention that the decisions here for these purposes track one another very closely. That is to say the decisions in IPR 2131, 2132, and 187. I'll be referring mostly to the appendix in the decision of the 187 proceeding. What's new here? 22F is old, isn't it? 22F was known at least since 1983 in the free polysaccharide vaccine Mimivax. But that 22F serotype was not conjugated until the Merck reference came along in 2011. And I can walk through that a little bit in a moment, Your Honor, but the point there is that this field is unpredictable. It's unpredictable to generate these conjugates and have them elicit a functional antibody. It's even more unpredictable to put them together in a multivalent composition and have them all in that multivalent composition elicit functional antibody across all the serotypes. But the petitioner's experts said exactly the opposite of that, and the board evaluated both sides' evidence and came out on the other side. Don't we have to affirm that? I think the board overlooked the unpredictability in the field and overlooked the fact that without a conjugate being produced in the prior art, there's no evidence of reasonable expectation of success that it would be immunogenic. That is to say that it would elicit functional antibody, which is a requirement of the claims. In fact, none of the petitioners, none of the board in the final written decision even addressed whether these multivalent compositions elicit functional antibody. They glossed over this. The board accepted your construction of immunogenic, didn't it? Yes, they did, and what they did, Your Honor, is in the decision, and I'll get the site for you, in the decision, they said, just as immunogenic means immunogenic across all the serotypes, the fact that the GSK reference uses the term immunogenic necessarily means that all the conjugates in the GSK reference would be immunogenic. That's not proven in the evidence. Moreover, the judge in the decision. Why isn't that a reasonable inference from the GSK 711 reference? Because when you look at the data in the GSK 711 reference, there's no data on eliciting, excuse me, on eliciting functional antibody. There's an IgG serum data across all the serotypes, which admittedly elicits some immune response, but the only OPA assay data, which is required to demonstrate functional antibody, is with respect to serotypes 19A and 22F. There's no OPA data showing, and in fact there's no mention showing functional antibody across all these serotypes. If we disagree with you on that point and conclude that the GSK 711 reference does demonstrate immunogenicity, is it true that the only difference between the GSK 711 and claims 3 and 4, 4 in particular, is the absence of 15A? The GSK reference lists, well, the GSK 711 reference lists serotype 15B, which is in claim 3. It also lists the serotypes that are provided in claim 4, but it provides them in a laundry list of serotypes. It never exemplifies those serotypes in conjugates in the examples. It simply says, well, it will be immunogenic, but it provides no data for that. And this field is unpredictable. I'd like to, if you don't mind, Your Honor, I'd like to, if I could direct the court to the table and paragraph 159 of Seropi's expert, sorry. Just to make sure. I think I said 15A. You're talking about 15B. Correct. Correct, Your Honor. Yes, it's 15B. But to come back to it, the point is that this is not a predictable field. Having knowledge of prevalent serotype does not automatically get you to the conjugate. Certainly not the conjugate that elicits functional antibody. It's even more unpredictable to take that conjugate and combine it with other conjugates in a multivalent composition that elicits functional antibody across all the serotypes. And I direct the court to the table and paragraph in Seropi's expert, Dr. Lee's, at APPX 24960. And if you have a look at that, you'll see that at the top of them, the top rows list the serotypes that we're discussing here. 15B, 12F, 11A, 10A, and 8. And that table in the far right shows those serotypes that were known in Mimivax. That's the free polysaccharide vaccine that was approved in 1983, not conjugate. The first mutococcal conjugate vaccine that was approved that included conjugates, Prednar, had seven serotypes. None of those were the serotypes that I've mentioned. That was approved in 2000. That's 17 years after Mimivax was approved. The next serotype vaccine that Pfizer got, Prednar 13, took another 10 years to get approval. And Merck's vaccine, which added 22F and 33F in the Merck 2011 reference, or the Merck 086 reference, came along after the Pfizer reference. The GSK, GSK-Synflurex, only had 10 bound. They had to actually remove serotype 3 for immune interference problems. The point is, this is not a predictable field. It's not, oh, I know the serotype, I can make a conjugate with it, have it elicit a functional antibody, and then include it in a multivalent vaccine. It's just not the case. And we believe the evidence doesn't support that. On functional antibody, I'd like to draw the court also to the attention of the testimony that we took of Dr. Casper on this issue. And this is at the appendix 4145 to 4146. Now, I asked Dr. Casper in his deposition about claim three. And I said, would it be routine to make a claim, a multivalent conjugate with serotypes 33F, 15B, and 22F? And he said, to get an immune, yes. To get an immune response, sure. But I defined immunogenic as functional antibody in the questioning. And he said, functional antibody, I can't predict that. That, to me, directly contradicts what the board found in these cases. What about Dr. Lee's? Do you have the same deficiency, in your view, in terms of applying the immunogenicity construction? In Dr. Lee's, yes, I do, Your Honor. In Dr. Lee's deposition, we asked him, this is at appendix 31359 to 360, we asked a similar question. Would it be routine optimization to make a multivalent composition that's immunogenic? Would that require routine optimization? Here is his response. I was called as an expert in the synthesis of conjugates, not in immunology. I'm not in a position to answer that question. Okay, but you don't contend that Dr. Lee's failed to apply the construction properly, do you? Well, that's a great question, Your Honor. In the opening declaration, Dr. Lee's glosses over the term immunogenic. He doesn't define it. He doesn't define it in his opening declaration. The petitioner did. Dr. Lee's, in his opening declaration, just points to various evidence and never says whether, never directly says whether it's functional antibody. In his deposition, I asked him, do you agree immunogenic means functional antibody, and he said yes in his deposition. His reply declaration doesn't address the issue so far as I can see. If just one of the experts in one of these five IPRs we're reviewing applied the correct construction, do we have substantial evidence to uphold the board? I don't believe so, Your Honor, because I think the evidence unequivocally shows the unpredictability here that when you have a serotype alone, that's not enough to get a conjugate. Conjugate development is not easy. We have testimony from our experts. Our expert, Dr. Boones, APPX5456, no single conjugation chemistry generates conjugates uniformly suitable across serotypes for a vaccine. Our expert, Dr. Wang, no single, at APPX29437, no single protocol applies for generating conjugates for all serotypes. Counselor, you're into your rebuttal time. You can continue or save it as you wish. Thank you. Let me move on very quickly here, time flies. I just want to say one thing about, a few quick comments about the motion to amend. The motion to amend, we think, is an abusive discretion in finding the claims obvious in the motion to amend. We think that it's an abusive discretion because it found the claims obvious over Hausdorff in view of the secondary reference, Merck, in the face of evidence in the Merck reference that there was no reasonable expectation of success. Claim 46 requires a 14-valid composition, and it requires that it elicit a two-log increase across all 14 serotypes. That's exactly what the Merck reference did. It took the 13-valid composition of Hausdorff, it didn't try to increase it, and when it did, Table 4 of that reference shows that there was no two-log increase across all the serotypes. We think that's directly contrary to the judge's finding and the evidence. Now, I have a little time left, but I want to also say, Claim 48 and Claim 49, they require all 14 serotypes elicit a two-log increase. Nobody, the board or the petitioners below, has addressed whether the serotypes of those claims elicit a two-log increase across all serotypes in the composition. With that, I'll reserve the rest of my time. Thank you. Thank you. Mr. Gutmann. Yes, Your Honor. Good morning, Your Honors. May it please the Court. The board's decision is supported by substantial evidence and should be affirmed. There's nothing inventive about the claims of the 559 patent and the proposed substitute claims that were proposed by Pfizer in its motion to amend. Those claims are directed to known immunogenic compositions comprising known conjugates made from known immunogenic polysaccharides that are routine and optimizable. Could you talk about 48 and 49 and that two-log limitation? I don't see where the board ever addressed where that limitation was disclosed in the prior article. Yes, Your Honor. So, what the board did with Claims 48 and 49, there's no heading in the final written decision that says, here's our analysis relating to Claims 48 and 49. But the analysis that supports the judgment by the PTAB that Claims 48 and 49 are obvious is throughout the final written decision. For example, the board undisputedly analyzed the obviousness of Claim 46 and even Pfizer doesn't argue that there's no analysis. Specifically, the two-log increase for the serotypes that are added in 48 and 49 that are not in 304 or in 46. Where is that analysis? Yes. So, for example, if you go to the final written decision at Appendix 350. So, this is a portion. I just need another second to get there. 350 doesn't talk about 48 and 49. And if you go to 356, it doesn't talk about 48 and 49. If you go to 35, we conclude that Claim 46 would have been obvious over Hausdorff and the others. Yes, Your Honor. On Appendix 350 in the final written decision, the board is addressing whether it's the two-log increase in immunogenicity as broadly applied across all the serotypes. Not serotype-specific can be optimized in order to achieve a two-log increase. What language on 350 are you specifically referencing? Is this the first paragraph after the... Yes. So, for example, the board in the first paragraph is referring to the testimony by Sanofi's expert, Dr. Van Alphen, regarding the fact that a two-log increase across all serotypes by routine optimization. Specifically, Hausdorff reported several studies examining the immune response to the 13VPNPC composition in New Zealand white rabbits. And so, what the board is saying there is that the two-log increase, which is not serotype-specific, can be achieved through routine optimization. It doesn't matter whether it's a serotype that is disclosed or recited in Claims 48 and 49, or a serotype recited in Claim 46. They are using Dr. Van Alphen's expert testimony to conclude that it is a matter of routine optimization to achieve a two-log increase in immunogenicity by, for example, picking rabbits that have a low baseline or optimizing the amount of adjuvant that is used in the study. You're saying what applies to 46 also applies to 48 and 49? Yes, because the board's conclusion regarding the optimizability of the two-log increase is not predicated on a specific serotype. They are finding, as a matter of fact, that a two-log increase can be achieved regardless of what specific serotype is at issue. And in fact, there was no evidence in the record that any of the serotypes that were specifically addressed in Claim 46 had unique properties that made them routinely optimizable that would not be achieved with other serotypes. And Pfizer didn't put any evidence in the record on that. What about the unpredictability in the field that your opposing counsel talked about? So Pfizer made the argument, that precise argument that is in their opening brief, in their reply brief, and that my good friend made here earlier, that the immunogenic composition of serotypes in development field, multivalent PCV compositions, is unpredictable. That argument was made by the board. It was considered by the board. It was found to be unpersuasive by the board. And the board credited the evidence of record, the substantial evidence of record, that supports their conclusion that molecular weight, for example, is routinely optimizable. So the board considered Pfizer's argument that it was unpredictable and rejected it. And I don't think it's proper for Pfizer to be asking this court to re-weigh the evidence and re-litigate factual disputes that were squarely put in front of the board and considered by the board. You say considered. Your friend says they overlooked the unpredictability. Do you consider the unpredictability of the art? Well, I think I would start with the fact that the board concluded that molecular weight was routinely optimizable. I think the fact that they found that it was optimizable, there was considerable substantial evidence in the record to support that. For example, in GSK 711. So it's implicit in the finding of routine optimizable. Do they explicitly say and it's predictable or at least not unpredictable? Or do we just find it implied in the finding of routine optimizable? It's at least implied. I don't have a site to give you standing here where the board specifically mentions unpredictability and rejects it. But I think when you look at the final written decision and you consider the substantial evidence of record that supports their conclusion that molecular weight is a routine optimizable results effective variable, that it's undisputed that Pfizer made the unpredictability argument during the PTAB proceedings. And the fact that the board found that molecular weight was a routine optimizable results effective variable, I think, acknowledges and confirms that the board considered the argument and rejected it. And there is substantial evidence in the record, regardless of any argument that it is that Pfizer made an unpredictability argument, but it wasn't specifically addressed by the board. I'm not saying that's what happened, but let's assume that's what happened. Under the substantial evidence standard, there's still record evidence that is substantial evidence that supports the conclusions by the board that molecular weight is a routinely optimizable results effective variable. And there's no dispute that there's overwhelming evidence, not just substantial evidence, to support that finding. You know, Pfizer's argument, my colleague's argument earlier, that there's no exemplification of the serotypes in claims three and four in GSK 711. The board, again, specifically addressed that argument and found that exemplification is not necessary and that the record evidence did support the fact that the claims are obvious. Just a second. Could you return to 48 and 49? Yes, Your Honor. The language that you relied on earlier at A350 is a quote from Dr. Alphin. I don't see that the board expressly adopts that quote. Is there language in which the board expressly states what you assert they implicitly, at least, made a finding that would extend the logic of 46 over to 48 and 49? Well, I think in the middle of this page on 350, the board states, Dr. Van Alphin states, that the data that's in house for... But they're just quoting him there. They're not specifically adopting his statement, right? I'm looking for something more concrete, suggesting or stating that they specifically endorsed the view that what was good for 46 was also good for 48 and 49. I don't think they tie it specifically into claims 48 and 49. Is that a problem? I don't think so, Your Honor, because the question is whether there's substantial evidence in the record to support the judgment by the board. No, but the judgment by the board, there has to be substantial evidence to support a finding on which the judgment can be made. We can't make that finding, obviously, under Chenery. Well, the board made findings that would support the obviousness of claims 48 and 49, even though they didn't specifically relate those findings to claims 48 and 49. And I think those findings, still under the substantial evidence standard, support the judgment by the board that claims 48 and 49 are obvious. What I think you're saying is you think a finding that all serotypes will predictably or routinely have the two log increase would necessarily encompass the serotypes that are added in 48 and 49. That logically makes sense, but I don't see where the board made that finding, that all serotypes will have this two log increase. Is the place where the board made that finding A350, or is it somewhere else? Well, the board found that a two log increase is routinely optimizable, and the board does have a discussion in the final written decision regarding all of the different variables in measuring the immunogenicity of the serotype that could be optimized in order to achieve a two log increase. So, for example, they say they made findings that the baseline could be reduced, and they made findings regarding the fact that... I think I understand all that. I'm just not seeing where the board says this applies to all serotypes, or less than that, which would also be fine for you, this applies to all serotypes that are added in 48 and 49. I don't see where either of those findings exist. I don't think they said that explicitly it applies to all serotypes, but they didn't say it applies only to specific serotypes, and I think a reasonable inference from that is that it does apply to all serotypes, and again, there's no evidence in the record that the serotypes in claim 46 are somehow unique from the serotypes in claim 46. There are no unique serotypes in claims 48 and 49. Thank you, counsel. I think we have your answer, and you're into the patent officer's time, but we'll give her five minutes. Thank you, your honors. Good morning, your honors. May it please the court. As stated in our 38-J letter, since the carousel decision effectively renders Pfizer's APA claims moot, I'd like to address some of the questions your honor posed to Sanofi. The first is that, at least in the Merck challenges, there is no evidence that Pfizer's APA claims moot. The board did make express findings about claims 48 and 49, and you can find those in the appendix at ABBX 154-155. And the court relies in those cases on the expert testimony of Dr. Casper and the fact that, as the board found at page 155, the patent owner provided no evidence that, to rebut the petitioner's assertions or Dr. Casper's expert testimony, that serotype 15B would also be included in the mention and in Dr. Casper's testimony, that that would produce an immediate immunogenic serotype specific response. Where on 154-155 does the board talk about the two log increase? Okay, the two log increase, if you look at the appendix at 143-145, if you look at page 143, you'll see Merck's table 2. I'm sorry, table 4. My apologies. And table 4 includes the non-PREVNAR serotypes. If you look at table 4, you can see the board's finding just underneath it. I'll read it here. In table 4, Merck 2011 teaches the fold rise in antibody levels to the non-PREVNAR serotypes from day 0 to day 28. That's meaning that matches the expressed terms of supplemental claim 46. And then if you look to the following paragraph, they specifically point to the results that are greater than 100. 100 being two log or two folds. They say that these things, that these serotypes, at least in these sets of rabbits, produce more than a two log or two folds increase in immunogenicity. And you can see that in the table itself. With respect to 48 and 49, we're talking about primarily the 15 serotype. And then that's why I would say, going back to the board's decision at APPX 154 and 155. And the board relies on Dr. Casper's testimony that at least the polysaccharide for that serotype, not the conjugate, admittedly not the glycoconjugate, had been used in the past and had been shown to be immunogenic. And that the board found that this at least meant, based again on expert testimony, that this was on everyone's mind. That this was a routine optimization and that this would have been reasonably predictable as to that specific serotype. And so those are the points I wanted to address. There's a contention that he failed to apply the correct construction of immunogenicity. Are you familiar with that argument? It certainly wasn't something that I recall being raised in the Merck decisions. An argument being raised there. However, I would say that that is mooted by the board's finding with respect to Merck's tables 2 and 3, tables 3 and 4. You see this immunogenicity across all manner of serotypes. And the board's general finding that everyone in its guild in the ART knew that this was a routine optimization. They knew that molecular weight affected immunogenicity. They knew that molecular weight ranges had to be determined for each individual serotype to maximize immune response. They knew how to create, isolate, and identify glycoconjugates of a variety of molecular weights. And they knew how to test for their immunogenicity and they had done. Yes, I would say that substantial evidence supports the board's determination that this molecular weight ranges were results effective activity. And that they were routinely optimizable. And while it may have been not doing so, may have been not obvious in the past, that time has long since passed. And that this court should affirm the board's decision. Thank you, counsel. Mr. Schreiberler, you want to take three minutes? Yes, thank you, your honor. So for claims 3 and 4, just to quickly note that the board, the evidence that the board glossed over this decision is further shown that in the decision, you'll see that the board doesn't even mention serotypes 12F or 8 from claim 4. It mentions those serotypes in connection with the discussion of the prior ART, but in the analysis, zero. In the subheadings, nothing. That's just another thing. On the motion to amend in claim 46, we think this case lines up factually and legally with the Strathclyde case that we've cited at page 25 and 27 of our reply brief. In that case, the board found the claim obvious over two references. The secondary reference, the NITSAN reference, explicitly tried to, explicitly had data where it tried to achieve the claim that it did. And it failed. And we think that lines up with the facts here. Because as Dr. Paradiso showed in the excerpt of the table 4 of the Merck reference, which is at APPX 31021, and at the excerpt of table 3, APPX 31027, he highlighted in those tables, in the table 4, he highlighted instances in all four study arms where the Merck vaccine failed to elicit the two log increase across all four study arms. All the serotypes in the composition. Now, that study in table 4 reports on eight serotypes. It doesn't even report on all the serotypes that are listed in claim 46. So the Merck reference is silent as to whether the two log increase can be achieved in the other serotypes. The challengers say, oh, well, that's all shown in Hausdorff, the lead reference, the Hausdorff reference. But that's ridiculous, Your Honor. What Merck did in Merck 2011 is try to extend the Hausdorff teaching, which the Hausdorff teaching was a 13-valent conjugate. The Merck reference tried to increase that. Tried to add 22F and 33F. The data in table 4 shows that when Merck tried to increase that, that valency of that multivalent composition, it was unable to achieve two log increase across all the serotypes. The data in table 3, our expert, Dr. Paradiso, also reported on that. And that's a comparison of the Merck vaccine to Prevnar, the 7-valent vaccine. Our expert, Dr. Paradiso, showed that there were instances there where the Merck PCV7 vaccine, and he highlights this at 31027, he highlights several instances where the Merck vaccine had a poor immunogenic response than Prevnar. And some of those, which you'll see, he's got a red box around entries that Merck considered statistically significant. The PTO mentioned APP, oh, excuse me. The Serophy's Council mentioned APPX350. That's Serophy's experts saying, to get to the two log increase, just optimize the test conditions. That it's easily done, and that the references show one log and two log mixed results, skilled arts, and could allow you to optimize test conditions. That's hindsight. It's also addressed in the Strathclyde decision that I mentioned earlier. In Strathclyde, the board said, oh, the primary reference says you can optimize test conditions, light dose, illumination, time and culture, to eradicate the MRSA bacteria. And the board said, well, even in the absence of a photosensitizer, you could still get, the primary reference shows that you could optimize test conditions. That's not the case.